UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.                                    Case No.  07-CR-57

BRUCE FURR,
STEVEN FURR,

                    Defendants.

DECISION AND ORDER ADOPTING MAGISTRATE JUDGE RECOMMENDATION
AND DENYING FURRS' MOTION TO DISMISS (DOC. 572)

          Bruce and Steven Furr move to dismiss this case for violation of the Speedy Trial

Act, 18 U.S.C. § 3161, and their Sixth Amendment right to a speedy trial.  Magistrate Judge

Patricia J. Gorence recommends that this court deny the motion.  Although the court finds

the Sixth Amendment issue to be a close call, the motions will be denied.

          Regarding a motion to dismiss a magistrate judge may propose findings and make

recommendations; the ultimate decision is for the district judge.  28 U.S.C. § 636(b)(1)(A),

(B); Fed. R. Crim. P. 59(b)(1).   The district court judge must review de novo the

recommendations of the magistrate judge to which a party timely objects.  28 U.S.C.

§ 636(b)(1)©; Fed. R. Crim. P. 59(b)(2), (3).  Portions of a recommendation to which no

party objects are reviewed for clear error.  *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739

(7th Cir. 1999).  The clear error standard means that the court can overturn the magistrate

judge's ruling only if it is "left with the definite and firm conviction that a mistake has been

made."  *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 943 (7th Cir. 1997).

## SPEEDY TRIAL ACT

Magistrate Judge Gorence recommends rejection of the Speedy-Trial-Act argument as insufficiently developed. This court agrees.

The Speedy Trial Act (STA) provides that a defendant must go to trial within seventy days of his first appearance before a judicial officer or the indictment, whichever is later. 18 U.S.C. § 3161(c)(1). But the statute sets forth numerous exclusions to that time period. Certain time periods "shall be excluded" and thus are automatically not counted, regardless of whether they actually caused delay. § 3161(h); *United States v. Hills*, 618 F.3d 619, 626 (7th Cir. 2010). For instance, delay due to any mental competency or physical capacity proceedings regarding the defendant shall be excluded, as is delay from any interlocutory appeal, consideration of a proposed plea agreement by the defendant, or a motion through its prompt disposition. § 3161(h)(1)(A), ©, (D), (G). Also, a reasonable period of delay shall be excluded when the defendant is joined for trial with a codefendant as to whom the time has not run and no severance has been granted. § 3161(h)(6). Other time is excluded upon a finding by a judge that the ends of justice served by delay outweigh the interest of the public and the defendant in a speedy trial. § 3161(h)(7)(A).

As recognized in § 3161(h)(6) and by the Seventh Circuit, the presence of codefendants in a case affects the STA calculations. *See United States v. Tanner*, 941 F.2d 574, 580 (7th Cir. 1991). Congress has indicated its preference for joint trials and intends that delays resulting from the joinder of codefendants be liberally excluded. *Tanner*, 941 F.2d at 580; *United States v. Dennis*, 737 F.2d 617, 621 (7th Cir. 1984). The Seventh

Circuit has stated that under § 3161(h)(6),[1] excludable delay of one defendant "'may be ascribed to all codefendants in the same case, absent severance.'" *Tanner*, 941 F.2d at 580 (quoting *Dennis*, 737 F.2d at 620). And although Bruce and Steven Furr have sought severance multiple times, severance has not been granted.

With an exception inapplicable here, a defendant bears the burden of supporting his STA motion. 18 U.S.C. § 3162(a)(2). Failure to develop a speedy-trial argument, whether under the STA or Sixth Amendment, results in waiver of it. *See United States v. Loera*, 565 F.3d 406, 412 (7th Cir. 2009) ("*Loera I*") ("[E]ven though Loera mentioned the Sixth Amendment in his motion to dismiss, his argument revolved entirely around the Speedy Trial Act. In his eight-page supporting memorandum, Loera never uttered a word about the Constitution. By failing to develop the constitutional issue in the context of the earlier case, Loera waived it.").

In the reverse of the *Loera I* situation, the Furrs mentioned the STA in the title of their motion but thereafter did not mention it other than to state generally that the speedy-trial right set forth in the Sixth Amendment is fundamental "and has been codified in the Speedy Trial Act, 18 U.S.C.S. § 3161-74," that this Court should protect their constitutional and statutory rights to a speedy trial, and that the STA preserves society's interest in ensuring swift prosecutions. (Doc. 573 at 3-4, 6; *see id.* generally.) The arguments in their initial brief concerned only Sixth-Amendment speedy-trial jurisprudence. (*See, e.g.*, Doc. 573 at 2 (introducing argument by referencing only the four-factor constitutional speedy-trial right test).)

---

[1] The subsection was numbered (h)(7) at the time. *See Tanner*, 941 F.2d at 578 n.2.

Not until their reply brief did the Furrs provide any argument concerning the language of the STA. In their reply they pointed out that delays caused by codefendants are excluded only if such delays do not exceed a reasonable period, though they acknowledged that whether delay was reasonable depends on the facts of each case. (Doc. 586 at 14 (citing 18 U.S.C. § 3161(h)(1), (6)).) The Furrs pointed out in passing the usual STA rule that a maximum of thirty days are excluded for a motion under advisement. (Doc. 586 at 4.) They argued generally that a designation of a case as "complex" under local rules does not allow the case to extend over six or seven years without a trial date. (Doc. 586 at 14.) Additionally, the Furrs pointed out the lack of specific findings under § 3161(h)(7). (Doc. 586 at 14-15.) Moreover, they asserted that "the docket confirms that during the six-plus year period since indictment, there are multiple seventy-plus day periods of non-excludable time" (Doc. 586 at 13), but they did not specifically challenge or discuss particular time periods.

Magistrate Judge Gorence found that by not addressing the STA in the opening brief and not providing a specific challenge under the STA even in their reply, the Furrs failed to develop the STA argument and waived it. Consequently, she recommended denial. (Doc. 594 at 43.) This court agrees and finds that the challenge was not properly made in the Furrs' initial brief or even in the reply brief.

In their objections, the Furrs contend that *Loera I* does not apply because it concerns the Sixth-Amendment speedy-trial right rather than the STA right. According to the Furrs, there are statutory requirements for a waiver of STA rights and the STA right does not expire until trial or a guilty plea—so even as of today it has not expired. (*See* Doc. 604 at 11-12.) But waiver of STA rights is an apple to the orange of a waiver of an argument.

Regardless of whether the STA provides a statutory bar after trial or a guilty plea, courts operate on motions deadlines and briefing rules. *Loera I* comports with the longstanding rule that a litigant waives an argument by failing to make it. *See Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 480 (7th Cir. 2010) ("[H]er appeal is the first time that she claims that her transfer from dispatch was an adverse employment action, and she has thus waived that claim."); *Burton v. City of Franklin*, No. 1:11-cv-00267-JMS-TAB, 2011 WL 2938029, *2 (S.D. Ind. July 18, 2011) ("It should go without saying that the Seventh Circuit adheres to the longstanding rule that a litigant waives an argument by failing to make it."). The waiver rule exists concerning proceedings before the magistrate judge and objections or appeal to this court just the same as exists for proceedings before this court then the Seventh Circuit. Arguments not raised in front of the magistrate judge and raised for the first time in objections made to the district judge are waived. *Isringhausen Imports, Inc. v. Nissan N. Am., Inc.*, No. 10-CV-3253, 2011 WL 1331886, *4 (C.D. Ill. Apr. 6, 2011); *Zendejas v. Reel Cleaning Servs., Inc.*, No. 05 C 6933, 2009 WL 2431299, *8 (N.D. Ill. Aug. 6, 2009); *see United States v. Melgar*, 227 F.3d 1038, 1040 (7th Cir. 2000) ("[A]rguments not made before a magistrate judge are normally waived. . . . "[T]here are good reasons for the rule that district courts should not consider arguments not raised initially before the magistrate judge, even though their review in cases governed by 28 U.S.C. § 636(b)(1) is *de novo*.").

And arguments made for the first time in reply are also deemed waived. *United States v. Kennedy*, 726 F.3d 968, 974 n.3 (7th Cir. 2013); *United States v. Gallardo (Flores)*, No. 13 CR 660, 2015 WL 278908, *5 (N.D. Ill. Jan. 21, 2015). Thus, by making

no more than a few passing references to the STA in their initial brief, the Furrs waived any STA argument.

But even if STA arguments in their reply brief and objections are considered, the arguments were not sufficiently developed. The Furrs have provided no precise calculation of exact days elapsed and unexcused days versus days of excludable time. *See, e.g., United States v. Abad*, 514 F.3d 271, 273 (2d Cir. 2008) (defendant counted 223 unexcused days while the government counted three). They refer to chunks of time regarding pending motions without noting that portions of those time periods could be excluded under other clauses as well. For instance, the entire time the present motion to dismiss has been pending, Daxesh Patel's plea agreement has been pending without acceptance by the court in New Jersey. Delay caused by Fed. R. Crim. P. 20 proceedings of a codefendant is excludable under § 3161(h)(1)(G). *Tanner*, 941 F.2d at 581. Similarly, the Furrs fail to acknowledge or address whether 978 days are excludable due to the appeal filed June 4, 2010 (appeal number 10-2367), which was not decided by the Seventh Circuit until March 8, 2013. (Appeal number 10-3014 was also pending for 315 days during this time period.) The Furrs discuss the "reasonable time" language of § 3161(h)(6), but fail to parse when it applies to codefendant delays compared to when subsection (h)(1), which does not mention reasonableness, applies (such as related to "any interlocutory appeal"). And though the Furrs note that codefendant delays under § 3161(h)(6) must be reasonable they fail to argue specifically regarding what was reasonable or unreasonable in this case (Doc. 586 at 14), such as whether the time from the filing of Daxesh Patel's plea agreement to the present is reasonable or properly excluded.

In their objections, the Furrs discuss the time spent by the court deciding motions, but they fail to address the argument sufficiently. Generally, the STA excludes delay caused by a pending motion from the time of filing until a hearing on the motion or for up to thirty days after the court receives the last filing on the matter. § 3161(h)(1)(H); *United States v. Pansier*, 576 F.3d 726, 732 (7th Cir. 2009). However, when a court is called upon to decide multiple motions, that period may be extended beyond thirty days as long as the court resolves the pending motions with reasonable promptness. *Pansier*, 576 F.3d at 732. The Furrs fail to discuss what amount of time they consider to have been reasonable for Magistrate Judge Gorence to decide the privilege issues of the Furrs and defendants Balsiger and Curry, and then for this court to address the objections, with due consideration for the volume of allegedly privileged documents and issues involved, the multiple revised logs and briefing, and the other motions filed during that time period. Even the Furrs have admitted that their codefendants' privilege issues were "complex" and could involve an interlocutory appeal. (Doc. 604 at 6; Doc. 258 at 13.)

In their objections, the Furrs fault the government for not arguing that the delays caused by Balsiger and Currey's pretrial conduct were reasonable. But again, the Furrs bear the burden of establishing that the STA was violated. And, importantly, the government cannot be expected to respond to arguments that were not raised in the initial brief; nor can it be faulted for failing to predict what the Furrs would argue for the first time in their reply.

In sum, the STA argument was not made in the Furrs' initial brief on their motion and was insufficiently raised in their reply brief. Thus, in this court's view, the magistrate judge's recommendation for denial of the STA motion was correct. Moreover, even if the Furrs

added to the STA argument in their objections, they nevertheless failed to develop it sufficiently. Hence, the motion based on STA rights will be denied.

## SIXTH AMENDMENT RIGHT TO SPEEDY TRIAL

The Sixth Amendment guarantees that an accused "shall enjoy the right to a speedy . . . trial." U.S. Const. amend. VI. To determine whether the right has been violated, a court considers four questions: (1) whether delay before trial was uncommonly long, (2) whether the government or the defendant is more to blame for the delay, (3) whether the defendant asserted his right to a speedy trial, and (4) whether the defendant suffered prejudice as a result of the delay. *Doggett v. United States*, 505 U.S. 647, 651 (1992); *see Barker v. Wingo*, 407 U.S. 514, 530 (1972). This balancing test involves "a difficult and sensitive process." *Barker*, 407 U.S. at 533. No one factor is necessary or sufficient for a finding that the speedy-trial right has been violated. *Id.*

The four factors are not simply assessed individually. "[T]hey are related factors and must be considered together with such other circumstances as may be relevant." *Id.* For instance, "[t]he presumption that pretrial delay has prejudiced the accused intensifies over time." *Doggett*, 505 U.S. at 652. According to the Seventh Circuit, two recognized forms of prejudice "are really just aspects of the length of delay." *Loera v. United States*, 714 F.3d 1025, 1031 (7th Cir. 2013) ("*Loera II*"). And a defendant's invocation of his right to a speedy trial can be counterbalanced by contrary actions that cause delay. *See United States v. Oriedo*, 498 F.3d 593, 600 (7th Cir. 2007) (noting in regard to the third factor that although Oriedo said he opposed certain continuances he later sought numerous continuances of his own and filed a motion that delayed the case).

The Supreme Court has indicated that the speedy-trial right is amorphous, depends on the circumstances, and is consistent with delays. *Vermont v. Brillon*, 556 U.S. 81, 89 (2009). The four-factor balancing test requires the court to approach speedy-trial issues on an ad hoc basis. *Barker*, 407 U.S. at 530. There is no per se rule of constitutional law that requires trial within a fixed time. *United States ex rel. Mitchell v. Fairman*, 750 F.2d 806, 810 (7th Cir. 1984). The right cannot be quantified into a specified number of days or months. *Barker*, 407 U.S. at 523. And given the availability of the STA, "there shouldn't be many cases in which federal defendants successfully invoke the speedy trial clause." *Loera II*, 714 F.3d at 1032.

(1)     Length of Delay

At the outset, the first factor is a triggering mechanism; unless the time between accusation and trial crossed a minimum threshold of about a year, the court need not consider a constitutional speedy-trial argument. *Doggett*, 505 U.S. at 651-52 & n.1; *Oriedo*, 498 F.3d at 597. If the analysis is applicable, the court then considers the extent to which the delay stretches beyond that year. *Doggett*, 505 U.S. at 652; *Oriedo*, 498 F.3d at 597. The assessment of delay depends upon the circumstances of the case as "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Barker*, 407 U.S. at 531. In *Barker*, the Court noted that over five years between arrest and trial in a murder case was extraordinary. *Id*. at 533. Magistrate Judge Gorence found that the length of delay in this case significantly exceeds the minimum; therefore, this factor weighs in favor of the defendants. (Doc. 594 at 44.) Here, almost eight years have elapsed since indictment, so the minimum threshold was crossed

long ago.  Trial is now set for October 26, 2015.  Eight years is an extremely long time for a criminal case to be pending, and some of the alleged criminal acts occurred years before the indictment.  But this is not a routine gun charge or even a standard drug conspiracy case for which even a year might be considered too long.  This case has been complex since it began, involving conduct occurring in at least four different states in this country as well as Mexico; eleven individual defendants living in Texas, Indiana, and New Jersey; a twenty-seven count superseding indictment including twenty-five claims of wire fraud with five alleged victims, a count of conspiracy to commit wire fraud, and a count of conspiracy to obstruct justice; and a coupon business processing millions of coupons and generating millions of dollars.  The government indicated at one point early in 2007 that it held over ten tons of physical evidence in warehouses and had already provided defendants with 116,000 pages of discovery.  (*See* Doc. 99 at 3; Doc. 87.)  Privilege claims alone initially involved over 9000 documents.  Getting the case to trial within the one-year threshold would have been extraordinary.  Thus, the eight years is tempered substantially by the size and complexity of the case.

(2)     Blame for the Delay

The Supreme Court has called this second factor the "flag all litigants seek to capture."  *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986).  For this factor, the court examines the course of pretrial proceedings for the reason for delays.  *Hills*, 618 F.3d at 630*; Oriedo*, 498 F.3d at 597.  The aim of the inquiry is to determine whether the government or the criminal defendant is more to blame for the delay.  *See Doggett*, 505 U.S. at 651; *Maples v. Stegall*, 427 F.3d 1020, 1026 (6th Cir. 2005).

Because pretrial delay is often inevitable and wholly justifiable, different weights are assigned to different reasons for delay. *Hills*, 618 F.3d at 630; *see Brillon*, 556 U.S. at 90; *Barker*, 407 U.S. at 531. Delays resulting from one party's need to prepare are obviously attributable to that party. *Hills*, 618 F.3d at 630. And reasonable delay caused by a defendant's own motions should be attributed to him. *See Loud Hawk*, 474 U.S. at 316-17 ("'Having sought the aid of the judicial process and realizing the deliberateness that a court employs in reaching a decision, the defendants are not now able to criticize the very process which they so frequently called upon.'").

Deliberate bad faith delay by the government to hamper the defense or gain some impermissible advantage weighs very heavily against the prosecution. *Brillon*, 556 U.S. at 90; *Doggett*, 505 U.S. at 656. Similarly, deliberate disruption of proceedings by a defendant weighs heavily against that defendant. *Brillon*, 556 U.S. at 93-94.

Negligence by the government weighs against it, but less heavily than deliberate delay. *Id.* at 90. Government negligence in bringing a defendant to trial neither compels relief nor is automatically tolerable. *Doggett*, 505 U.S. at 656-57. But toleration of negligent delay wanes as the length of delay grows. *Id.* at 657. In other words, presumed prejudice from government negligence grows over time. *United States v. Dionisio*, No. 04-cr-30-bbc, 2008 WL 4534352, at *6 (W.D. Wis. Oct. 6, 2008) (Crocker, M.J.), *adopted by* No. 04-cr-30-bbc, 2008 WL 4949914 (W.D. Wis. Nov. 17, 2008) (Crabb, J.).

Delays resulting from a trial court's schedule are generally attributed to the government but weighted less heavily. *Hills*, 618 F.3d at 630; *see Brillon*, 556 U.S. at 90. Moreover, "'[d]elays due to the complexity of the case and the large number of defendants

support a finding that no Sixth Amendment violation occurred.'" *Hills*, 618 F.3d at 630

(quoting *United States v. Bass*, 460 F.3d 830, 836 (6th Cir. 2006)).

The Furrs initially devoted little argument to the issue of blame, treating this factor

as a given in their favor. Their entire argument on blame for delay was as follows:

> Further, as this Court well knows, Bruce and Steven Furr are not to
> blame for the inordinate delay in bringing this case to trial. A substantial
> portion of the last six-plus years was consumed by protracted privilege
> litigation, the cause of which was indisputably the government's insistence on
> pursuing documents held by IOS's lawyers, hundreds of which were privileged
> to one or more of the individual defendants in this case. The Furrs
> participated in that litigation only to the extent necessary to preserve the
> relatively few documents truly privileged as to them; an assertion proven true
> by the fact that this Court upheld the vast majority of the Furrs' claims of
> privilege.

(Doc. 573 at 3.) But the Furrs' lack of blame is not self-evident as this paragraph suggests.

In their reply brief on the motion and in their objections, the Furrs argue that delay

caused by other defendants, in particular Thomas Balsiger and James Currey, should not

be attributed to the Furrs.[2] The Furrs contend that their constitutional right to a speedy trial

cannot be supplanted by the actions of delay-causing codefendants, especially here, where

the Furrs sought severance to avoid that very result. (Doc. 604 at 6.) As support, the Furrs

point to caselaw from the Sixth Circuit.

In *Maples*, the Sixth Circuit addressed delay caused by the defendant (Maples), his

codefendant, and the court. Early in the case, Maples filed various motions in limine and

a motion to continue, then the codefendant filed an entrapment motion that was pending for

---

[2] The Furrs devote more argument to the issue of blame in their reply brief and in briefing on
objections. As with the STA argument, the court could find the right to further argument has been waived.
However, because the constitutional argument as a whole was substantially challenged in the opening brief,
the court will consider the Furrs' expanded arguments regarding blame.

almost three months before Maples joined it. After the decision another three months later, the case was continued for fourteen months, initially because the state failed to transport the detained Maples for trial and then either because of the codefendant's motions to continue or for unexplained reasons.

The Sixth Circuit found that the initial nine- to ten-month delay (through the decision on the entrapment motion) was minimally attributable to Maples but largely caused by the codefendant's actions and the court's delays, and the time following the entrapment decision was entirely attributable to the court's unexplained continuances. 427 F.3d at 1026. The Sixth Circuit noted that while the general rule in STA cases is that excludable delay of one defendant is attributed to all, no case stated the same principle for a constitutional speedy-trial claim. 427 F.3d at 1027. The court then found that Maples would not be required "to carry the full burden of his co-defendant's delays" because the codefendant had less incentive to resolve the case, Maples had nothing to do with the codefendant's delays, and Maples asserted his speedy-trial right. *Id.* at 1028. Though Maples had joined the entrapment motion after it was filed, at most he could be held responsible for about three months. *Id.* The time following a decision on the entrapment motion, consisting of several unexplained adjournments, was attributed solely to the state, as it bore responsibility for negligence and over-crowded dockets. *Id.* at 1028-29.

Nevertheless, the *Maples* court expressly declined to "decide under what circumstances one defendant who delays joining a codefendant's motion should be held responsible for the full amount of time taken in ruling on the motion," suggesting that its decision applied only to the specific circumstances at hand. *Id.* at 1026 n.3. Regarding a codefendant's motions for continuance, the court stated:

13

> We believe this determination to be circumstances-dependent and we do not find that delay associated with a co-defendant's motion to continue can never count against a defendant. . . . In deciding whether delay caused by a co-defendant's motion should count, we will examine whether the defendant objected to the continuance, whether the defendant moved the trial court to comply with speedy trial requirements, whether the defendant moved for release, and whether the defendant's position and interests are aligned with the co-defendant.

*Id.* at 1028 n.5.

*Maples* is not controlling precedent and the parties have not pointed the court to any Seventh Circuit case directly addressing how to attribute blame for a codefendant's delays. However, in various Seventh Circuit cases delays caused by codefendants were considered as part of the constitutional speedy-trial analysis, and they did *not* weigh against the government. In *Oriedo*, the Seventh Circuit considered five continuances requested by codefendant Smith and eleven continuances requested by Oriedo. 498 F.3d at 597-98. According to the court, the delays occasioned by codefendant Smith's motions, "amounting to a year, are at best neutral and not chargeable to the Government simply because it elected to try together both defendants involved in a single conspiracy." *Id.* at 599. In *Hills*, the Seventh Circuit considered together the delay caused by the three defendants. 618 F.3d at 630-31. In *Abad*, the Second Circuit considered together delays regarding both defendants, including those relating to a possible death penalty review by the Department of Justice concerning the codefendant. 514 F.3d at 273, 274-75.

Thus, based on Seventh Circuit caselaw, even with consideration of *Maples*, this court will not charge codefendants' delays against the government. At most any delays attributable to codefendants is considered neutral. However, the delays may be chargeable to the Furrs to the extent they participated in those delays.

Magistrate Judge Gorence's recommendation sets forth much of the procedural history of this case for purposes of the present motion. (*See* Doc. 594 at 37-41.) Substantial delay was caused by the privilege litigation involving the Furrs and defendants Balsiger and Currey. The Furrs argue that only minimal delay from privilege litigation should be attributed to them.

First, the Furrs seek to place blame for privilege-litigation delays on the government because the government raised the privilege issue before reviewing documents obtained from former defendant International Outsourcing Services LLC (IOS) and its lawyers after the company waived its privileges. According to the Furrs, the cause of delay "was indisputably the government's insistence on pursuing documents held by IOS's lawyers, hundreds of which were privileged to one or more of the individual defendants in this case." (Doc. 573 at 3.) In their reply brief they deem the primary cause of delay in this case as "the Government's strategic decision to pursue hundreds of privileged documents." (Doc. 586 at 2.) They say the "Government created the privilege litigation morass that has consumed hours of attorneys' and the Court's time by indicting 12 defendants and then seeking thousands of privileged documents from one of those defendants, IOS." (Doc. 586 at 3.)

But the United States bears no direct blame for the privilege litigation. The government was permitted to investigate relevant evidence obtained after IOS directed its law firms to produce company files. The IOS Board of Directors proposed and approved the cooperation agreement and privilege waiver. (See discussion at Doc. 316 at 16-17.) And litigating the privilege issue was for the *defendants'* benefit, not the government's. Privilege must be claimed and supported by the party seeking it. *In re Grand Jury Proceedings*, 220 F.3d 568, 570 (7th Cir. 2000). That the government recognized that

15

documents it obtained from IOS's attorneys could be privileged for individual defendants did not mean that any of the defendants were forced to claim such privilege. It was *the Furrs'* choice to claim privilege as to particular documents, and they did.[3] This court finds that the government bears no blame whatsoever for delays caused by any defendants regarding the privilege litigation. *See Oriedo*, 498 F.3d at 599 ("[T]he delays occasioned by his co-defendant's motions, amounting to a year, are at best neutral and not chargeable to the Government simply because it elected to try together both defendants involved in a single conspiracy.").

Next, the Furrs seek to place blame for delay on codefendants Balsiger and Currey. The Furrs challenge the recommendation as lumping their actions with those of defendants Balsiger and Currey, attributing to the Furrs the conduct and privilege litigation delay of those other defendants. (*See* Doc. 604 at 4-5.) According to the Furrs, a codefendant's discovery dispute cannot trump their Sixth Amendment right to a speedy trial. (Doc. 604 at 5.) They argued in their initial brief that they participated in the privilege litigation "only to the extent necessary to preserve the relatively few documents truly privileged as to them; an assertion proven true by the fact that this Court upheld the vast majority of the Furrs' claims of privilege." (Doc. 573 at 3.) They contend that they promptly submitted revised privilege logs as directed by Magistrate Judge Gorence and corrected the relatively limited number of issues with their claims (when compared to the number of issues regarding their codefendants' submissions). (Doc. 604 at 4.) According to the Furrs, Magistrate Judge

---

[3] According to the Furrs, the documents at issue in the privilege litigation must not have been crucial for the government because it indicted without them; thus, say the Furrs, the privilege issue was collateral to the criminal case. (*See* Doc. 586 at 3-4.) But this court is not the arbiter of what evidence the government wishes to have for trial; moreover, the government could not know what the documents contained until this court ruled them unprivileged.

Gorence's May 2011 order found that only twelve documents of the Furrs' were either mixed privilege or not privileged, and the subsequent resolution of the government's objection from that order involved Lance Furr and Steven Furr but not Bruce Furr. (Doc. 604 at 4-5.)

Delays caused solely by Balsiger and Currey certainly cannot be attributed to the government; at most they are neutral. However, delays can be attributed to the Furrs to the extent that the Furrs joined in with the Balsiger and Currey litigation, which they did in many ways. Contrary to the Furrs' argument in their initial brief, their own privilege litigation did not concern only a "relatively few documents." (*See* Doc. 573 at 3.) Balsiger and Currey submitted a log that contained over 7700 privilege claims. Rather than compiling a log of their own, the Furrs in January 2008 adopted Balsiger and Currey's claims. (*See* Doc. 215 at 84-85.) Plus, they filed their own privilege claims for over 700 documents. (*See* Doc. 249 at 8; Doc. 594 at 39; Doc. 162 Exs. B-F.) Balsiger and Currey's privilege logs were revised. In August 2008, the Furrs confirmed that they continued to adopt Balsiger and Currey's modified claims; at the time the logs for those materials contained over 4700 documents. (Doc. 594 at 39; *see* Doc. 202 at 32.)

The Furrs compare their privilege claim regarding 700 documents to the thousands of documents claimed by Balsiger and Currey. But 700 is a still large number of documents for the court to review, and because the court's review of those documents occurred contemporaneously with that of Balsiger and Currey's documents, time attributable to one or the other is not easily parsed. And although the Furrs contend that the magistrate judge and this court upheld the vast majority of their privilege claims, not all the documents were found to be privileged.

It appears true that Balsiger and Currey have dragged this case out; neither has seemed at all interested in bringing this case to trial. They filed privilege logs regarding several thousand documents. As noted by Magistrate Judge Gorence, many of the logs were inadequate and the claims of privilege meritless, so the privilege logs had to be revised. (*See* Doc. 594 at 39.) Balsiger and Currey filed two interlocutory appeals and two mandamus actions. And Balsiger's lack of action on hiring a new trial lawyer since Sib Abraham's death six months ago is seen by this court as reluctance to move the case forward.

The Furrs have not procrastinated similarly but they are not blameless, either. They adopted privilege claims over thousands of documents, several of which were clearly not privileged, and they claimed privilege for over 700 of their own documents. Taking these considerations in the Furrs' favor, to the extent that Balsiger and Currey may be solely to blame for delays, the court is treating those delays neutrally for purposes of the present motions. But to the extent that the Furrs joined in on those delays to any extent, weight is placed on them.

Further, the privilege litigation delays overlapped with delays caused by several other motions filed by the Furrs. Time spent by Magistrate Judge Gorence addressing those various motions caused delay in her getting to the privilege matter. And the delays caused by the Furrs' pretrial motions is directly attributable to them. Such delays include a motion for speedy trial (Doc. 230), filed on October 29, 2008, and the following motions filed by one or both of the Furrs on December 18, 2008: their motions for bill of particulars (Docs. 253, 257, 262), motion to sever (Doc. 258), and motion to transfer (Doc. 255), motion to dismiss for violations of their Fifth and Sixth Amendment rights (Doc. 256), and motion to dismiss

for violation of Bruce Furr's Fifth Amendment rights (Doc. 254).  Several of these motions were decided by Magistrate Judge Gorence on June 16, 2009 (Doc. 315), but the Furrs then appealed; this court affirmed on August 21, 2009 (Doc. 346).  In affirming the denial of the Furrs' motion for speedy trial, this court mentioned that the Furrs had "been actively engaged in pretrial litigation, which has consumed substantial time by all involved."  (Doc. 346 at 10.)  Magistrate Judge Gorence issued a recommendation on the motions to dismiss on June 25, 2009 (Doc. 316), and this court adopted her recommendation (following the Furrs' objections) and denied those motions on August 25, 2009 (Doc. 347).  Thus, all of this delay between October 29, 2008, and August 25, 2009, is attributable to both Bruce and Steven Furr, and that delay caused further delays in resolution of the privilege matters.

Also on December 18, 2008, Bruce Furr filed a motion to suppress evidence seized from his office (Doc. 261).  Magistrate Judge Gorence issued a recommendation on July 29, 2009, that the motion be denied.  (Doc. 342).  Bruce Furr objected and requested an evidentiary hearing, and this court granted the request.  An evidentiary hearing was held on November 23, 2009, and this court denied the motion to suppress on February 2, 2010 (Doc. 277).  This additional delay is attributed to Bruce Furr.

The court is also mindful that delays caused by the court must be considered and that the time motions were under advisement must be taken into account.  Many motions (outside of the in camera document reviews and the present motions) were decided with relative dispatch considering the complexity of the case.  But the privilege issues were not.  However, much of the delay before the magistrate judge and this court was caused by the volume of privilege claims (more than this court has seen in any case before) and the "woefully inadequate" logs.  (*See* Doc. 379 at 12.)  Logs were revised, split, and renamed

along the way. And although the parties reference briefing on the privilege matter being completed in December 2008, complete briefing did not mean that the court had what it needed to decide the privilege issues. The logs were still inadequate. On March 15, 2010, Magistrate Judge Gorence explained that she had

> spent countless hours reviewing the often haphazard privilege logs submitted by the defendants. From the court's extensive review, it is apparent that the defendants did not properly review all of the logs before submitting them to the court. Although the volume of privilege claims filed by defendants Balsiger and Currey magnify the problems with their logs, the logs submitted by the Furr Defendants are not without their own difficulties. Based on the problems with numerous log entries, the court is unable to properly determine as to whether the stated privilege does, in fact, apply.

(Doc. 379 at 14-15.) Magistrate Judge Gorence pointed out problems with the Furrs' privilege logs such as lack of an author and the inability to locate on the submitted CD-Rom disk any of the documents from one privilege log and several specific documents on two other privilege logs. (*Id.* at 9-10.) Because of problems with numerous log entries, the court could not determine whether stated privileges actually applied. The Balsiger/Currey logs had missing information and several errors as well. (*Id.* at 10-14.) The Furrs, Balsiger, and Currey were ordered to submit amended privilege logs.

The Furrs seek to pass blame to the government for the time between Magistrate Judge Gorence's ruling on the privilege issue in May 2011 and this court's decision in July 2013, because the government, not the Furrs, appealed the ruling. (*See* Doc. 586 at 4.) But they overlook the fact that they abandoned their privilege claims over seven documents still at issue while maintaining their privilege claim as to five other documents. Thus, the government's appeal appears valid as to some of the documents while the Furrs still

maintained their claim of privilege as to other documents, requiring further briefing and court review.

Some of the court delays in this case were caused by the structure of criminal case processing. The assignment to a magistrate judge for pretrial processing generally expedites matters concerning discovery and routine motions, but not so when the parties appeal the magistrate judge's rulings, as has occurred in this case. And for motions to suppress and to dismiss, the recommendation and objections add an additional level of briefing and an additional period of consideration by another judge. Those periods of delay add up if the case bounces back and forth between magistrate judge and district judge as it did here. (By the court's count this is the eighth set of objections or appeals to the district judge. (*See* Docs. 240, 346, 347, 354, 377, 402, 440, 530, 556.))

But the length of the delay for the privilege decision was directly tied to the magnitude of the task. Magistrate Judge Gorence originally had before her privilege claims for over 9000 documents, then 7700, then 4700, then 2000. The Furrs had their own set of hundreds of privilege claims separate from the Balsiger/Currey claims. Magistrate Judge Gorence's May 11, 2011, decision concerned her review of over 2000 documents. Then, the government appealed that decision as to about 325 documents. Consequently, this court had to reconstruct what had occurred before the magistrate judge to ascertain which were the final logs; which documents had to be found for review; and where those documents were located, as the documents had been submitted multiple times in multiple formats. Further, the parties incorporated arguments from prior briefs, requiring the court to go back and to review documents that had been submitted to the magistrate judge months or years before. Moreover, the motions involved issues of privilege waiver by

members of a joint defense team, the crime-fraud exception, and individual versus corporate privilege. The court's chart of names of attorneys, defendants, and witnesses for purposes of determining the writers and recipients of correspondence contained over 100 names. And while Magistrate Judge Gorence had simply set forth her rulings as to the documents, this court provided specific reasons for the documents on appeal, requiring careful assembly of explanations in an order and an attachment.

In *United States v. Young*, 657 F.3d 408, 415 (6th Cir. 2011), the Sixth Circuit contrasted that eleven-year complex case involving twenty-five defendants, numerous motions, and over 3600 docket entries from *Maples*, in which there were very few motions and the continuances were unexplained. Thus, the reasonableness of delay due to the court's consideration of a motion depends on the number and complexity of the motions and the number of defendants bringing the motions. Here, the several months from submission of the final filings on the privilege issue before the magistrate judge until her decision and the several months between the final filings on the appeal from that decision (in December 2011) and the decision by this court were not substantially unreasonable. To the extent they were, this factor weighs lightly against the government. *See United States ex rel. Mitchell*, 750 F.2d at 808-09 (stating that although twenty-two months to adjudicate a motion to suppress "are a lot, we cannot ascribe fault to the state"). The Furrs have conceded that this "is an exceedingly complex case." (Doc. 573 at 7.)

But this small weight against the government is significantly outweighed by the delay attributed to the Furrs regarding their motions and privilege issues. On August 21, 2009, when denying one of the Furrs' prior motions to dismiss based on speedy-trial grounds, this court found that the Furrs had not demonstrated that the government was more culpable

22

for delay than the Furrs at that point. (Doc. 346 at 9-10.) While no precise parsing of this case into specific months or years of blame since then can be made, the heavier-weighted delays caused by the Furrs regarding their motions and privilege issues (and their participation in some of Balsiger's and Currey's privilege issues) substantially outweigh the light-weighted delay against the government for the court's failure to issue prompt decisions on motions.

(3)     Assertion of Right

The quality of the defendant's assertion of his right to a speedy trial is considered in the speedy-trial analysis. *Oriedo*, 498 F.3d at 597. However, contrary actions are considered as well. See *id.* at 600; *United States v. Taylor*, 196 F.3d 854, 862 (7th Cir. 1999) (noting that simultaneous demand for a speedy trial and effort to delay proceedings make the demand "entitled to little, if any, weight"). For instance, in *Abad*, the court noted that the defendant raised his speedy trial rights opportunistically, i.e., when it suited his interests but not when delay benefitted him. 514 F.3d at 275.

Magistrate Judge Gorence recommended that this factor weighs in the Furrs' favor. The Furrs do not object to that recommendation, and this court agrees. However, the weight of this factor should be tempered slightly by some inconsistency. The Furrs filed motions for a speedy trial in June 2007 (asking for trial in September or November 2007), and October 2008 (asking for trial in February 2009). (*See* Docs. 88, 230.) In April 2008 they asked the government to schedule a trial in September or October 2008. (Doc. 271 Ex. G.) In December 2008 the Furrs sought severance to ensure their speedy trial rights. (*See* Doc. 258 at 12-13.) In the severance motion they asked for a trial date in February

23

2009.  (*Id.* at 3.)  And they filed the present motion.  Thus, the Furrs have timely and frequently asserted their speedy-trial rights.

However, there have been contrary actions as well.  Although they moved for a speedy trial and sought severance in late 2008 seeking a trial in February 2009, the Furrs filed numerous other motions that were not fully briefed until March 2009, and at the same time they were also pursuing hundreds of privilege claims.  Thus, although they asked for a speedy trial the Furrs were also pursuing matters that prolonged this litigation.

In their initial brief regarding the present motion the Furrs state:  "Through this filing, Bruce and Steven Furr incorporate their prior speedy trial requests and all briefs in support of their pleadings."  (Doc. 573 at 3 n.1.)  Parties seeking a speedy trial should not attempt to incorporate by reference (and certainly without specifying all the document numbers for those briefs) a multitude of documents previously filed in a case that now involves over 600 docket entries.  Recently, Bruce Furr objected to any immediate competency examination and argued that any such exam should take place only one month before trial.  But if he cannot assist in his defense, the a quicker examination could resolve his case more quickly. And at the December 2014 status conference, when asked when they could be ready for trial, Steven Furr's counsel stated that they could be ready in the summer 2015.  Thus, although this factor generally weighs strongly in the Furrs' favor, it is diminished just slightly.

(4)     Prejudice from the Delay

The Supreme Court has recognized three types of harms from unreasonable delay: (a) excessive pretrial incarceration; (b) anxiety and stress of the accused, including financial stress; and © impairment of the accused's defense such as through dimming memories and loss of exculpatory evidence.  *Doggett*, 505 U.S. at 654; *see Loera II*, 714 F.3d at 1031;

24

*Hills*, 618 F.3d at 632.  The most serious of these forms of harm is the last, "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."  *Doggett*, 505 U.S. at 654; *Barker*, 407 U.S. at 532.  For instance, the death of a witness during the delay could be a serious detriment if the witness would have testified favorably for the defendant.  *See Barker*, 407 U.S. at 532; *State ex rel. Mitchell*, 750 F.2d at 809.  But in the absence of a missing witness, this last form of prejudice may be difficult to prove:  "though time can tilt the case against either side, one cannot generally be sure which of them it has prejudiced more severely."  *Doggett*, 505 U.S. at 655 (citation omitted).

Affirmative proof of prejudice is not essential to every speedy trial claim, and some prejudice is presumed; however, presumptive prejudice alone cannot carry the day without regard to the other factors.  *Doggett*, 505 U.S. at 655-56.  Presumed prejudice is "insufficient to carry a speedy trial claim absent a strong showing on the other *Barker* factors," but even if not dispositive it is part of the mix of relevant facts in the balancing analysis.  *Oriedo*, 498 F.3d at 600.  And generally, "as long as the government shows reasonable diligence in prosecuting its case, a defendant who cannot demonstrate prejudice with specificity will not show a Sixth Amendment violation, no matter how long the delay." *Hills*, 618 F.3d at 632.  Moreover,

> realism requires recognition that given the government's heavy burden of proof in criminal cases, delay in bringing a case to trial often works in the defendant's favor:  if both prosecution and defense witnesses, or *a fortiori* only prosecution witnesses, suffer from fading memories, delay will reduce the likelihood of a conviction.

*Loera II*, 714 F.3d at 1031; *see Barker*, 407 U.S. at 521. Also, here, neither of the Furrs has been incarcerated during the pendency of this case. Thus, no related prejudice has occurred.

Regarding impairment of defense, nothing in the record shows any serious prejudice to the Furrs' defense. The Furrs state generally that as witnesses' memories have faded exculpatory testimony "concerning the nuances of Bruce Furr's and Steven Furr's involvement with their family business has undoubtedly been lost" (Doc. 573 at 7), but they provide no specific examples. This is not a case like *Dionisio*, in which the government made a tactical decision on extradition, leading to a four-year period between indictment and arrest. *See Dionisio*, 2008 WL 4534352. There, regular purging of doctor's office records occurred before Dionisio was arrested, and any documents that were not purged were later destroyed by flooding. Moreover, Dionisio's memory dimmed regarding details of the medical care he provided with respect to 890 claims identified by the government and an unrecorded interview with government agents. *Id.* at *9-*10. Here, the Furrs have not pointed to specific evidence that has been lost such as details of specific meetings, interviews, or conversations or certain documents that have been destroyed.

In *Hills*, the Seventh Circuit found that the defendants failed to demonstrate prejudice even when two witnesses testified that the passage of time affected their memories. Notwithstanding that testimony, one witness indicated that tying a date to a given meeting would enable him to answer and neither failed to answer particular question due to memory loss. *Hills*, 618 F.3d at 632. Another witness who had trouble remembering events attributed the lack of recollection to an accident that occurred decades earlier, not due to

the passage of time while the case was pending. Another witness testified that a stroke affected his ability to speak, not his ability to remember. *Id.* And while the defendants identified two witnesses who were no longer available at trial, the defendants did not reference testimony the witnesses would have offered to help the defense; they merely speculated that the testimony might have helped. *Id.* at 632-33.

The Furrs have presented less than the defendants in *Hills.* Even in the Sixth Circuit, which issued *Maples,* when "the government prosecutes a case with reasonable diligence, a defendant who cannot demonstrate how his defense was prejudiced *with specificity* will not make out a speedy trial claim no matter how great the ensuing delay." *Young,* 657 F.3d at 418 (internal quotation marks omitted). And even if specific prejudice is shown, it must be substantial for the defendant to prevail on a speedy-trial claim. *Id.*

The Furrs contend that Bruce Furr's mental deterioration qualifies as an impairment, but they have failed to show how much deterioration has occurred over the last seven to eight years as opposed to pre-indictment. Their brief suggests that he has suffered health and memory problems since before the indictment. (Doc. 573 at 7.) Bruce Furr's attorney has declared that Bruce had cognitive issues in 2007 when the case began. (Doc. 573 Ex. 1, ¶¶ 1, 4, 10.) Counsel believed in 2008 and 2009 that Bruce Furr's memory was worse than that of his peers and that he was often incapable of remembering alleged key meetings or conversations. (Doc. 573 Ex. 1, ¶ 3.) But, again, that does not point to any impairment of a defense that exists more now than it did seven years ago. Moreover, counsel says that Bruce Furr was tested at the Mayo Clinic in 2009 and 2010 and doctors found indications that he was developing Lewy Body Dementia, an irreversible progressive dementia. (Doc.

573 Ex. 1, ¶ 7.) Yet counsel did not notify the government or this court of those findings until late 2013; if the condition was causing rapid deterioration, counsel may have provided that information earlier. Further, that memory problems identified early in this case were confirmed over four years ago does not establish that Bruce Furr's condition has eroded while this case has been pending. Counsel does state that he has found that Bruce Furr's "cognitive abilities have substantially deteriorated since [his] engagement six years ago." (Doc. 573 Ex. 1, ¶ 10.) But counsel does not provide the basis for his knowledge, such as his training or education in cognitive disabilities or specific examples of deteriorating memory.

Moreover, the Furrs fail to state how Bruce's mental impairment has harmed Steven's case. Their joint brief contends that Bruce Furr's health and memory issues prejudice father and son. (Doc. 573 at 4.) But Steven does not indicate what evidence Bruce would have had regarding Steven's case that is now unavailable. He fails to discuss, for example, what events Bruce would have testified to if his mental condition were better and whether such testimony is unavailable from other sources.

As for anxiety and stress, delay may interfere with a defendant's liberty (even if he is free on bail) and "may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends." *Moore v. Arizona*, 414 U.S. 25, 27 (1973) (internal quotation marks omitted). However, although community suspicion and anxiety that interfere with normal life create a disadvantage, *Barker*, 407 U.S. at 527, the court should consider "undue pressures" rather than the anxiety that normally accompanies criminal prosecution, *see United States v. Henson*, 945 F.2d 430, 438 (1st Cir. 1991), *cited in Hills*, 618 F.3d at 632.

The Furrs contend that their financial ability to fund their defense has been undermined by delay, but they have provided no evidence that they are financially stressed. And they fail to reference any particular cost related to the length of time the case has been pending. (*See* Doc. 573 at 5.) They say that the financial consequences of delay "have been exacerbated by the government's insistence that IOS's June 2007 Cooperation Agreement with the government strip the Furrs of their responsibilities and salaries from the now-defunct business." (Doc. 573 at 5.) But again, the loss of their company salaries is unrelated to the length of the case; they admit that the loss of salaries occurred in 2007. The Furrs state that since losing his role at IOS, Steven Furr has struggled to remain employed through a series of small business ventures (Doc. 573 at 5). But, Steven's job loss from IOS is unrelated to the length of this case. Moreover, the Furrs have provided no evidence that their salary losses were due to government action or government inaction as opposed to a business decision by IOS management or directors. Further, the Furrs have provided no evidence or specific discussion that their financial condition cannot support the defense they desire. They contend that had they been tried in 2007 or 2008 they would have saved hundreds of thousands of dollars relating to the privilege litigation or other pretrial proceedings, but a compressed schedule would not necessarily have resulted in the privilege issue being dropped.[4]

The Furrs also contend that their characters have been called into question and they have not had the opportunity to vindicate themselves in court. In support they point to

---

[4] In their objections, the Furrs point to a brief and attached exhibits filed in January 2009 to argue that the Furrs were denied proceeds from the sale of IOS and that Bruce's substantial tax refund was delayed for two years by the government. (Doc. 604 at 10-11.) But arguing this in the objections, rather than before Magistrate Judge Gorence, is too late.

newspaper articles from 2007 to early 2009, but not any articles that have been written over time. And they provide no evidence of particular anxiety related to these articles.

In their reply brief, the Furrs contend that their liberty has been impacted by having to have all international travel approved and by frequent home visits from pretrial services (*see* Doc. 586 at 10), but they have pointed out no other examples of restrictions on their activities and the record shows the opposite. Anxiety due to inability to travel internationally cannot be considered severe or undue. Moreover, the Furrs point to no instance when a travel request has been denied. To the contrary, for instance, Bruce Furr was permitted to travel to Mexico in March 2013. (Doc. 539.) As for home visits, the U.S. Probation Office for this district has told the court that home visits for Steven Furr occurred infrequently—only twice in 2014, for instance.

Steven Furr has stated under oath (in an affidavit filed with the reply brief) that the indictment in 2007 caused the loss of his good reputation within the El Paso community, his resignation from numerous community boards, and the desertion of many friends. (Doc. 586 Ex. A ¶ 3.) Embarrassment and anxiety from this case caused him to move his family (including school-age children) from El Paso to Boerne, Texas, 520 miles away, in June 2012 to begin a new life. (*Id.* ¶ 4.) Steven says the indictment ruined IOS, ended his life-long association with the family company, and caused his career to suffer. He speculates that without the stigma of the indictment hanging over his head he would have been able to seek executive-level employment elsewhere or financing for a small business. (*Id.* ¶ 5.) The stress from the case caused him to consult with a Stephen Minister[5] on a regular basis

---

[5] The Furrs do not describe what a Stephen Minister is, but a quick internet search suggests it is someone "trained to provide one-to-one, Christ-centered care to hurting people." Stephen Ministries St. Louis,

while he resided in El Paso. (*Id.* ¶ 6.) In addition, he states that when a major customer of a start-up company he founded learned of the indictment, the customer canceled its relationship with the start-up, citing uncertainty of the start-up's legal situation, including the pending indictment. As a result, the start-up filed for bankruptcy and Steven lost his $30,000-per-year consulting agreement with the company. (Doc. 586 Ex. A ¶ 8.)

This form of anxiety and stress does weigh in Steven's favor for purposes of the speedy-trial balancing, but not strongly, as no other prejudice regarding defense or incarceration appears to exist. Importantly, there is no indication that the Furrs' financial condition has been unduly difficult or that their defense has been impacted. They continue to be represented by top law firms.

(5)     Balancing

As noted above, the factors must be considered together. The longer the delay and the more vigorous the assertion of the right to a speedy trial, the more reason the government must show for the delay and the less harm the defendant must show. *Loera II,* 714 F.3d at 1032; *Dionisio*, 2008 WL 4534352 at *7. The Furrs believe Magistrate Judge Gorence did not adequately lower the level of prejudice necessary or demand greater justification from the government in light of the significant delay in this case. (*See* Doc. 604 at 3.)

The delay in this case has been substantial, weighing heavily against the government. But although the delay in this case has been substantial, the fault for that delay swings toward the side of the Furrs. Even though some of the fault for delay

---

https://www.stephenministries.org (last visited Jan. 23, 2015).

concerning privilege litigation and pretrial motions may lie with Balsiger and Currey, that fault is not attributed to the government, and the Furrs joined in the privilege litigation as discussed above. The Furrs' participation in that privilege litigation and in their own motion practice (filing several substantial motions during the same time period as the privilege litigation) weighs against them, substantially outweighing the light weight placed on the government for general delays or court delays. And the blame factor is an important one—the flag litigants seek to capture. Although the Furrs have asserted their speedy trial rights, those assertions have been tempered slightly. Importantly, Bruce Furr has established no actual prejudice other than the presumption of prejudice based on length of delay. Steven Furr has established a small amount of prejudice based on anxiety and stress. But neither has been incarcerated or has had his rights to travel substantially impaired, and neither has shown specific detriment to his defense.

In *Hills*, the Seventh Circuit found that no constitutional speedy trial violation occurred when the defendants were responsible for most of the over two-year delay and failed to demonstrate prejudice. *See* 618 F.3d at 632-33. In *Barker*, though the Court found five years for a murder case to be extraordinary, prejudice was minimal (even though Barker spent ten months in jail and lived under a cloud of suspicion following his release), Barker did not assert his speedy trial rights diligently, and during the pendency of the case he did not appear to want a speedy trial at all. *See* 407 U.S. at 534. Consequently, the Court held that Barker was not deprived of his speedy-trial rights. *Id.* at 536. In *United States v. Westmoreland*, 712 F.3d 1066, 1076-78 (7th Cir. 2013), the Seventh Circuit found that even an unexplained eight-year delay did not result in a speedy-trial violation when there was no showing of prejudice.

In contrast, in *Maples*, in which the Sixth Circuit found a speedy-trial violation, all four factors weighed in favor of Maples. *See* 427 F.3d at 1034. Significantly, Maples suffered all three forms of prejudice, including the unavailability of two witnesses. *See id.* at 1031-34.

Here, weighing these factors with the type of prejudice suffered, viewed in the context of the trial record as a whole, the Furrs have not demonstrated a denial of their constitutional rights to a speedy trial. Though it is a close call, as noted earlier, blame lies substantially more with the Furrs than the government, Bruce Furr has established no actual prejudice, and Steven Furr has presented only minimal prejudice. Also, while the length of delay and the assertion of the speedy-trial right tilt in the Furrs' favor, all of the factors disclosed above must be considered together. Therefore, in this complex litigation, the balancing of all factors tilts against the Furrs.

## CONCLUSION

For the foregoing reasons,

IT IS ORDERED that the magistrate judge's recommendation (Doc. 594) is adopted and Bruce Furr and Steven Furr's joint motion to dismiss for violation of their speedy-trial rights (Doc. 572) is denied.

Dated at Milwaukee, Wisconsin, this 10th day of March, 2015.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE